Your Honors, at its most basic level, this case argues that the District Court committed reversible error when it permitted the jury to decide the purely legal question of whether Municipal Police Officers Voss and Heineckman violated the Fourth Amendment rights of Carolyn Mitchell. Admittedly, not all Fourth Amendment cases present a purely legal question. Very often, material fact disputes exist. Sometimes officers will argue that there existed probable cause to justify stopping a suspect. Sometimes officers will argue that they used handcuffs on a suspect because they had objective safety concerns for themselves or the public. Sometimes officers will argue that a suspect acted uncooperatively and therefore justified pointing a weapon at a suspect. But none of these factual considerations existed with Ms. Mitchell's case. Officer Voss and Heineckman admitted that they lacked probable cause to arrest Ms. Mitchell. Officer Voss and Heineckman further admitted that they did not perceive Ms. Mitchell to be an actual threat to their personal safety or those around her. Counsel, may I ask you, what case, what's your strongest case to support the proposition that the probable cause or the finding of excessive force cannot be, or false arrest cannot be submitted to the jury? Well, I didn't, I think that the Fourth Amendment, well, I think the strongest case was the fact that we established before trial that Ms. Mitchell had been arrested and that the arrest was without problem. Well, the jury is only to decide disputes of fact, to judge credibility. Well, here this was a purely, a purely legal issue. I understand your argument. I'm asking you for the case authority in our circuit that supports your argument. What case can you cite that supports that argument? Well, I think that, I think Washington v. Lambert specifically stated that, and in that case, and that's what I cited referenced quite heavily in our motion for judgment as a matter of law, but there the Ninth Circuit reversed, or concluded that it was error for the district court to permit the case to go to the jury, where there was established that there was not an investigatory stop, but rather an arrest, and that that arrest occurred without probable cause. But as a procedural matter, that's what I'm asking you, as a procedural matter, is there anything that says the district court has to make that finding? Your Honor, I think that, I didn't see a specific case law that says that other than when the Rule 15a says that if there are no disputes of material fact, then the judge, you know, is to decide the legal questions before it goes to the jury. What we have here, by allowing it to go to the jury, the jury overturned the Ninth Circuit, overturned the United States Supreme Court, and basically said that even though Ms. Mitchell had been arrested, without probable cause, that was not a violation of her Fourth Amendment rights. Well, they were looking at the distinction between a Terry stop, which is a question of federal law, and false arrest, which was the question of Alaska state law. And what the judge was telling them, I guess, is that it was possible to have the officer violate the state law of probable cause to arrest, and yet, if it were an appropriate Terry stop, then they would not be liable. And Virginia v. Moore dealt with that issue, where perhaps there was an illegal arrest under state law, but that didn't violate the Fourth Amendment. But in that case, the officers had probable cause. In this case, there was no probable cause. Under state law, there was probably no probable cause. Under federal law, but then the question was, under federal law, was there an arrest? And they said, no, there was a Terry stop. Yeah, but the arrest, the issue of arrest, this Court has ruled that you look at states to determine whether an arrest had occurred. And the District Court didn't do that. It didn't look to state law in determining whether or not there had been an arrest, as opposed to a Terry stop. Well, they did at the summary judgment stage, and that was the issue at the summary judgment stage was, was this an investigatory stop? That had all been raised, and we argued, Gunaway v. New York, to argue that even though the police officers didn't say there was an arrest, everything occurred as if there was an arrest. And the District Court's order specifically said this was not an investigatory stop. This was an arrest. And they further argued that this was an arrest without probable cause. Did that evidence go before the jury, the fact that there was an arrest, a false arrest under Alaska law? Was the jury presented with that evidence? Any arrest without probable cause is an absolute violation of the Fourth Amendment. And so the jury was able to say, even though there is an arrest, and it was without probable cause, the Fourth Amendment still wasn't violated. What we did at trial, we established that there was an arrest. We didn't argue to the District Court that it was an unlawful arrest. We just argued the fact that there was an arrest, and the evidence at trial unequivocally established there was no probable cause. We presented that any time there is an arrest without probable cause, that is an absolute violation of the Fourth Amendment. Did the jury find that there was an arrest? Yeah, they had to grant damages on the fact that there was an arrest under state law. But we weren't allowed to mention that there was an arrest at all through trial. We had to mention that it was a detainment, even though we had established, as a matter of law, and the District Court specifically said, there is a finding as a matter of law that Officer Boston Heineken falsely arrested. That's what I asked you before. I asked you, was that information kept from the jury? And you said, no, it wasn't kept from the jury. Well, it wasn't. The jury instructions, we were not allowed to tell the jury that she had been arrested. And the jury instructions said, if you find there was an arrest under federal law, which makes it seem like there is some different assessment of what an arrest is. In fact, there was a jury question, what is an arrest under federal law? And there was no answer given. But what wasn't permitted was for us to say that an arrest, so we weren't able to tell the jury that the law says an arrest without probable cause is a violation of the Fourth Amendment. But we also went back and we said, Your Honor, okay, let's ignore the fact that there's an arrest. Washington v. Lambert says that under ordinary circumstances, any time the police use weapons and handcuffs on a cooperative suspect, and it's an ordinary circumstance, no danger, then that is an absolute violation of the Fourth Amendment. So either way, even if the district court judge didn't want to acknowledge that there was an arrest, at a minimum, there was those outside, there's not a bright line in the Fourth Amendment, but there should be far extremes. And in this far extreme, we had police officers using weapons and handcuffs on a cooperative suspect that they didn't fear in any way, and they didn't even ask her any questions. They didn't ask her, they didn't make a quick, swift resolution of the situation by asking, where were you five minutes ago? They said, by doing that, we'd have to give her her Miranda rights. So they believed that, and this is the policy fear that occurs. The only mistake that the municipality admits to is that the officers should have arrested DeMarcus. They should have put handcuffs on him and they should have held him at gunpoint simply because he was standing next to Ms. Mitchell. Go ahead. What's the question? I don't think anybody, including your opponents, are going to argue that what happened here was not a most unfortunate set of circumstances. I don't think they're going to try to justify what happened. But now the history of the case has taken place, and all of that record is before us. We've got to decide a specific question, and what is that question? A specific question is, is it permissible for officers to use weapons and handcuffs on a cooperative citizen? And that's the critical thing. Citizens of Anchorage are concerned about what they can do to prevent being handcuffed at gunpoint. There should be some level of assurances that, all right, if I say, yes, sir, if I put my hands to my side, what can they do to assure themselves that police officers aren't going to slam handcuffs on them and hold them for 20 or 30 minutes without asking any questions? And that's the critical issue here is that the Anchorage Police Department says they did nothing wrong and they do everything exactly the same, and that's the fear that Ms. Mitchell has. The difficulty is that the police were investigating a violent crime. Not committed by your client, but they were investigating a violent crime, so you have to balance those two. They weren't really investigating them because they asked her no questions. Well, they held her, though, until they brought somebody down who said right away, no, he's not the one. Yeah, but they said that if that took an hour, an hour and a half, that would have been permissible. So, I mean, she had bags on her. If they were going to do something intrusive, they could have asked to look at the receipt. But also, additionally, they poured her purse right out on the thing. They did a search of her purse for no reason. The very most important thing is that these officers handcuffed her, searched her, they were assured there were no weapons, and then they still kept the handcuffs on. Well, they had a description of the person, and she didn't meet the description, I think. She didn't really, other than the fact that she... I say she didn't. Yeah, yeah, yeah. She was an African-American female. She was shorter. She was lighter, you know, lighter build, and that was it. And just based on that, you know, I think that would be, at the most, in ordinary circumstances where an investigatory stop would occur. She walks out of a... What would they have done? What should they have done, in your view? I think they should have walked up and said, Ma'am, guns in their pockets, because everyone's walking out. Ma'am, there was a bank robbery ten minutes ago. You generally matched the description. Could you answer a few questions? And then if those questions rose reasonable, articulable suspicion, and maybe she shook, maybe she, you know, looked, you know, scared, then they could have followed through. And if she tried to dart, then they could slap the handcuffs or draw their weapons. But in this situation, they had those guns on her instantly and the handcuffs on her without batting an eye, and the officer said, I had her searched and assured there were no weapons within 30 seconds. Does it matter that there's been a jury trial when all of the arguments you're making now could have been made to the jury? Well, we were... Because we're reviewing now after. Yeah, I don't think... That was the sad thing here. When it's a legal issue, we don't get to... I didn't get to tell the jury, these are the elements of Washington v. Lambert. I wasn't able to tell the jury, Hey, you know, from time immemorial, you got an arrest without probable cause. That's, you know, an arrest. I wasn't able to argue the law. The jury instruction said, was it a reasonable... Did they act reasonably? And the jury, who watches Law & Order, Dirty Harry, and all these things, what do they know about the legal definition of when an arrest occurs? That's what the lawyer has to do. He has to give them a measuring rod. The judge wouldn't allow me to mention that she had been arrested or that that had any relevance. He specifically said that has no relevance to this Fourth Amendment violation. Counsel, you've exceeded your time. We'll give you some time for rebuttal. Let's hear from the city. Good morning. I'm Joyce Weaver Johnson, usually addressed as Ms. Johnson. I represent the Anchorage Police Department, the city of Anchorage, the officers, Lawson Hennickman and former Chief Monaghan. And I'd like to say, first of all, that there are foundational issues that may mean that the court need not or should not reach the merits. And I'll reserve those for a moment while I address what I think is our strongest... Well, one thing you can know is the case probably never would have been here if the police had apologized and said, we're so sorry, we did something we shouldn't have done. The case wouldn't be here. Don't you think that's true? I can't say, Your Honor. Well, we're not going to speculate either. We're going to decide the case on the record before us. But it's a situation where somebody ought to do a little public relations work, don't you think? I'll suggest that to you. Well, you don't have to suggest it because we're not going to decide the case on that. But I'm just curious as to why those things weren't done. Go ahead. We're going to decide the case on the merits, and that isn't the merits. That's just a curiosity of somebody who thinks, and I think I'm right. I think the case would have gone away. Well, we'll take that to heart. Thank you. Our strongest case, I think the case we rely on most, is Gallegos v. The City of Los Angeles. I think I dissented in that case. It might not be persuasive to me, but... I'm glad you mentioned that because I didn't want to point it out. It would put you on the spot. Don't worry. It wouldn't put her on the spot. Well, we'll cut to the chase then. Your dissent in Gallegos was that the officers... Oh, maybe I should go back and go over the facts. I know my dissent very well, so you don't have to remind me of that. All right. Well, maybe your brothers. On Melbourne Street in Los Angeles, a Miss Morales called 911 saying that her father was trying to break into the house and that she had a restraining order against them. LAPD got a helicopter overhead. The helicopter officers spotted someone coming out of the house across the street on Melbourne and described him, and he vaguely fit the description as seen from the air. And they communicated to officers on the ground who followed the man who had come out of the house across the street and driven away and eventually stopped him. And with, I believe, handcuffs and guns, detained him, put him in the police car, and eventually brought him back to Melbourne Avenue where his family looked in horror and said, that's our dad, that's our family member, that's not the guy you're looking for. And Miss Morales came out of her house and said something to the effect of heavens, that's not my dad, that's not the one you're looking for. And so it was a Section 1983 suit. Very much on all fours with this one, except that as you pointed out in your dissent, the officers did not need to transport, put him in a police car miles away, transport him back to the scene. They failed to check his identification and note that his name and his description did not match the person they were looking for. In all of those respects, Officers Voss and Hennickman did write in, as I would submit to the panel, they did check ID, although to an extent it was immaterial, because obviously the FBI and the police on the scene did not know the name of the bank robber that they were looking for. Counsel, here's the difference I see between this case and Gallegos. Even the majority opinion, with which I disagree, notes that there was reasonable suspicion to hold Mr. Gallegos. Was there reasonable suspicion in this case? I believe absolutely that there was, Judge, because she reasonably matched the description, that she was one of four women detained who more or less matched the description. What was the match? Besides her being an African-American female, what did she match? Heavyset, wearing some blue sweatsuit, workout suit. Did the officers consider her to be heavyset? Yes. Some of us might take exception. I think so. The description, as the court is probably aware from the record, the description evolved. There was a first 911 call. Later on there were more descriptors turned in by other women. How about the height? The height was not a match. It was within, I think, a few inches. That was almost a half foot. That's a lot. How about clothing? Some blue, casual, as it turned out. I think it said the person had a warm-up suit or something. I said enough so that the conclusions I read was what the person was wearing was a warm-up suit. Maybe I'm concluding wrong from what I read. I believe Ms. Mitchell was a very nice warm-up suit. Ms. Mitchell was a very elegant lady. But the descriptors changed. Early in this case, Ms. Mitchell's counsel tried to argue that it was racial profiling because they didn't stop any white people. Well, when the description is clearly, that's the one immutable characteristic that was in the description. And some of the other factors that officers in and around the mall did stop four people. As it happened, Ms. Mitchell was the last. Did they handcuff all of the four people? I don't know. That's not in the record. None of those people were witnesses, and Ms. Mitchell did not bring any of them into the case. So there are no police reports on any of this? The FBI talked to some of those people. The police talked to some of them. But the Anchorage Police Department doesn't make a report when it handcuffs someone or when it detains someone regarding this investigation of the robbery? There were no reports that would indicate what happened? There were one or two reports in the entire body of police reports about people they detained. The one that I recall seeing, and none of these were on the record from the trial. None of these were brought in. It was someone that was detained right in the bank a few minutes later and was not handcuffed. But at that point, she was surrounded by police anyway. So it's a question I can't answer, and it's not a record. What more should have happened in this case that didn't happen in order for Ms. Mitchell to have the cause of action she now alleges that she has? Judge, I believe the officers did everything they had to. I will not rule out that they were relatively young and probably nervous about making sure they didn't let anybody get away and perhaps someone with 10 or 20 years of experience would have apologized or chatted with her more. I think for these officers, there was a strong concern that it was not their investigation. They were only patrol officers controlling the scene, and they had been trained quite properly that armed robbers can have accomplices. They can have getaway cars coming to pick them up. We need to control the possible suspects and wait for things to simmer down. And it was not their investigation. It was not their job, nor would it have been proper for them to begin questioning any one possible suspect. I think that the strongest message of Diego's and the cases that come before it is if you've got a simple investigatory task soon to be completed, I'm paraphrasing the line of cases, then you can use the time it takes to do that. And this was an obvious and simple, really the only way to clear the suspects was to allow the time it took, which happened to be 20 to 30 minutes in the case of Ms. Mitchell, much less than Mr. Diego's, for the teller to simply be brought around to view her and the other possible suspects and clear them. Counsel, what are we to make of the fact that there was a finding of false arrest under state law? I believe, first of all, that Alaska case law on false arrest is very unclear and very poorly developed. Secondly, I believe, and Judge Sedgwick said, that he felt the record had been incomplete on summary judgment and that he viewed the case far differently after he'd seen and heard all the evidence. He never had an opportunity beyond our initial motion for reconsideration to rethink that ruling. So at trial we were stuck with it, and I do not believe that there was a false arrest under Alaska law. And if we were before the Alaska Supreme Court, which we're not, I would be arguing that. Are there other concerns of the courts? It looks as though I'm about out of time and I haven't started my argument. That's the way it goes sometimes. That's the break, sir. Thank you, Counsel. You submitted a brief, so we've got what I hope is your best shot. Let's hope. Thank you. Counsel, we'll give you one minute for rebuttal. Thank you, Your Honor. Your Honor, since opposing counsel brought it up, I just want to point out, not that you need reminding, but one of the cases you did cite in your dissent was Washington v. Lambert. You consider that very useful in assessing whether an investigatory stop had become arrest. But I like best your quote of United States v. Torres Sanchez. And you said that the critical inquiry is whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. You know what your problem is, Mrs. Zaria? You and rebuttal. She's not going to get to come back to say anything about what you're now bringing up. Is she? Well, she brought up, I'm rebutting her statement and her reference to Her Honor's dissent. Your problem is I was in the dissent in that case. So as strongly as I feel about it, it doesn't matter because my view did not prevail. It may matter now, though. All right. Thank you. Thank you. Thank you to both counsel. The case as argued is submitted for decision by the court. And thank you to counsel for able argument in this challenging case.
judges: Farris, Thompson, Rawlinson